### UNITED STATES of America, Plaintiff-Appellant,

### v.

### Raymond D. MASCIARELLI and Lawrence Schultz, Defendants-Appellees.

### No. 1269, Docket 77–1129. September Term, 1976.

United States Court of Appeals, Second Circuit.

Argued June 6, 1977.

Decided June 29, 1977.

Dante M. Scaccia, Syracuse, N. Y. (Love Balducci & Scaccia, Syracuse, N. Y., of counsel), for defendant-appellee, Masciarelli.

James P. Shanahan, Syracuse, N. Y., for defendant-appellee, Schultz.

Arthur A. Chalenski, Jr., Asst. U. S. Atty., Syracuse, N. Y. (Paul V. French, U. S. Atty. for the Northern District of New York, Syracuse, N. Y., of counsel), for plaintiff-appellant.

Before MANSFIELD, TIMBERS and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

Pursuant to an order of authorization issued under 18 U.S.C. § 2518 by Judge Edmund Port of the Northern District of New York, the F.B.I., from April 11 through April 25, 1974, wiretapped a telephone used by appellee Raymond D. Masciarelli in Binghampton, New York. The order, designated MP–16, stated that there was probable cause to believe that the phone was being used "in violation of Article 225 of the Penal Law of the State of New York and thereby in violation of Section 1955 of Title 18"[1] and in violation of the conspiracy statute, 18 U.S.C. § 371. MP–16 authorized wire interceptions relating to these gambling offenses for a maximum of 15 days and required the government to provide fifth and tenth day reports to the court pursuant to 18 U.S.C. § 2518(6).

During the first five days of the wiretap, the government intercepted a total of 283 calls, of which 275 were related to operation of a gambling business. One intercepted conversation was between defendant Lawrence Schultz in Akron, Ohio, and defendant Masciarelli (using the alias Ray Mills) in Binghamton, in which Masciarelli agreed to purchase from Schultz "line" information used for the purpose of setting "point spreads" in sports betting. The government summarized this conversation, noting the location of each of the parties,[2] in its Fifth Day Report to Judge Port, who thereupon approved continuation of the wiretap.

After being presented with tapes of the intercepted conversations, a federal grand jury on November 18, 1974, handed down one indictment charging Masciarelli and

1. Title 18 U.S.C. § 1955 makes punishable as a federal offense an "illegal gambling business" which is in violation of state law, involves five or more persons in its operation, and has been in business for 30 days or has gross revenue of $2,000 in any single day. Article 225 of New York's Penal Law prohibits the promotion of gambling and the possession of gambling records.

2. Paragraph 6 of the Fifth Day Report stated that:
 "One particular conversation from telephone number 724–5301 was placed to telephone number 1–216–688–1827 at Munroe Falls, Ohio, in the vicinity of Akron, Ohio, where the speaker who had identified himself as 'RAY' discussed his line information from Akron, Ohio. In the conversation a fee was discussed of $135.00 a month or $25.00 a week. 'RAY' indicated he would purchase his line by the month at $135.00 a month and indicated that he would use the name 'RAY MILLS' when obtaining his line information from that Akron, Ohio telephone number. The speaker at the other end indicated that 'RAY' should send his money to Post Office Box 2705, Akron, Ohio, for this line information. As a result of the intercepts on 729–1401, fourteen new code names have been heard in use. The thirteen names have been heard being used on the 724–5301."

nine others with operating a gambling business in violation of 18 U.S.C. § 1955, and another indictment charging Masciarelli and Schultz with interstate transmission of wagering information in violation of 18 U.S.C. § 1084.[3] Masciarelli and Schultz moved to dismiss the § 1084 indictment on the grounds that the interstate conversation, although it related to a violation of § 1955 as specified in the court's order, related to a violation of § 1084, which was not so specified, and the government had failed to obtain "as soon as practicable" a finding by Judge Port, as required by 18 U.S.C. § 2517(5),[4] to the effect that the "contents were otherwise intercepted in accordance with the provisions" of the federal wiretap authorization laws and an approval by him of its use other than in relation to a § 1955 prosecution. Defendants argued that since the government failed to comply with the requirements of § 2517(5), exclusion of the conversation and dismissal of the indictment was mandated by § 2515,[5] which prohibits the receipt by a grand jury or at trial of any intercepted communication disclosed in violation of the intercept laws, or any evidence derived therefrom.

On November 9, 1976, Judge Port dismissed the indictment in a decision from the bench, relying on *United States v. Brodson*, 528 F.2d 214 (7th Cir. 1975), and our decision in *United States v. Marion*, 535 F.2d 697 (2d Cir. 1976). Although indicating that he would have decided the case differently if "writing on a clean slate," Judge Port felt "obliged" to follow *Marion's* reasoning that communications relating to crimes not set forth in the order of authorization, "whether or not they also relate to specified crimes," 535 F.2d at 706, cannot be used as evidence of an unspecified offense unless judicial approval is obtained by the government through a timely subsequent application. Judge Port refused to find that his authorization to continue the wiretap after reading the Fifth Day Report complied with § 2517(5), since that report, although it disclosed the contents of the Akron-Binghamton conversation and that it was interstate in character, failed to mention that it would be evidence of a § 1084 offense as well as of the authorized § 1955 offense. From this order the government appeals.

## DISCUSSION

 In enacting § 2517(5) as part of the comprehensive wiretap provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2515, *et seq.,* Congress sought to balance two conflicting principles.[6] One is the necessity of protecting Fourth Amendment and privacy rights, which require scrupulous particularity as to

**3.** Title 18 U.S.C. § 1084 prohibits a person "engaged in the business of betting or wagering" from knowingly using "a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest. . . ."

**4.** Title 18 U.S.C. § 2517 provides that:

"(5) When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on

subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable."

**5.** Under 18 U.S.C. § 2515

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

**6.** See S.Rep.No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S. Code Cong. & Admin. News p. 2189, citing *Marron, infra,* and *Eisner, infra.*

the circumstances and reasons for an electronic search before permitting it to be authorized by the courts as a means of insuring that its scope will be limited and its invasion of privacy minimized. See *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *United States v. Marron,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). It was recognized that unless stringent detail were required the government might obtain an overly broad wiretap authorization for one offense as a pretext for gaining information with respect to offenses for which probable cause could not be established or for which wiretap authorization would be unavailable.[7] The countervailing principle is that where a law enforcement officer lawfully engaged in a search for evidence of one crime inadvertently comes upon evidence of another crime the public interest militates against his being required to ignore what is in plain view. *Harris v. United States,* 331 U.S. 145, 155, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); *United States v. Eisner,* 297 F.2d 595, 597 (6th Cir. 1962). See also *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (warrantless search). In permitting court authorization for electronic interceptions in investigations into certain types of crime, Congress provided that the court authorization must specify the offenses in connection with which the permission was granted and, should the law enforcement officer, in the course of conducting the authorized interception, come across communications relating to offenses other than those specified in the order of authorization or approval, he must obtain the authorization or approval of a court of competent jurisdiction as soon as practicable before the communications might be used in connection with the unspecified offense. 18 U.S.C. § 2517(5).

The government argues that there was no necessity in the present case to obtain authorization and approval under § 2517(5) for the Akron-Binghamton conversation in issue because it did in fact relate to the offense specified in the original order of authorization, clearly evidencing an important element of the conduct of an illegal gambling business in violation of 18 U.S.C. § 1955, which led to the grand jury's filing of an indictment against Masciarelli and others charging violation of that statute. The government contends that it therefore cannot be said that its application for the wiretap order in connection with its investigation into violations of § 1955 was a pretext. It urges that Congress, in using the phrase in § 2517(5), "communications relating to offenses other than those specified in the order of authorization or approval" intended it to apply only where the communications did not relate to the offenses specified in the order.

Were this a case of first impression appellants' interpretation might be persuasive. However, we are confronted with our own decision in *United States v. Marion,* 535 F.2d 697 (2d Cir. 1976), which repeatedly cites with approval the Seventh Circuit's decision in *United States v. Brodson,* 528 F.2d 214 (7th Cir. 1975). Both decisions interpret § 2517(5) as requiring that supplemental court approval promptly be obtained for conversations relating to an offense unspecified in the original wiretap authorization even though the communications also relate to offenses that were specified in that order. Confronted with these decisions the government asks us to overrule *Marion* or in the alternative to distinguish it on the ground that the unspecified offense there was, unlike that in the present case, substantially dissimilar to the offense specified in the original wiretap authorization. We find it unnecessary to take either of these courses in the present case for the reason that Judge Port, in authorizing continuation of the interceptions after being advised in detail of the interstate conversation in issue, gave sufficient approval to satisfy the requirements of § 2517(5).

7. Under 18 U.S.C. § 2516(1)(c) (Supp.1977) a wiretap may legally be obtained for a suspected violation of either § 1955 or § 1084.

■ Congress intended that judicial approval of the interception of evidence relating to unauthorized offenses might retroactively be granted pursuant to § 2517(5) upon a showing that

> "the original order was lawfully obtained, that it sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order." S.Rep. 1097, *supra* at 2189.

Where these conditions have been satisfied, nothing in the statute requires that the supplemental court authorization be express rather than implied. Indeed, in *United States v. Tortorello,* 480 F.2d 764, 781–83 (2d Cir. 1973), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1974), we decided that an implied authorization or approval would satisfy the requirements of § 2517(5). In that case the government had obtained a wiretap authorization under New York State law for a variety of state offenses, including grand larceny. During the course of carrying out the authorized interception the government uncovered a large-scale securities fraud scheme which it set forth in renewal affidavits to the New York State justice who had issued the original order of authorization. Although the federal statutes allegedly violated by the scheme were not specified, we held that the evidence obtained was admissible as proof of the federal crimes for the reason that the justice's renewal of the wiretaps satisfied § 2517(5) and its New York counterpart, New York Crim.Proc. Law § 700.65.

> "Neither the New York statute nor [§ 2517(5)] requires the issuing judge to announce formally in open court that he had noticed the interception of evidence not covered by the original order and has determined that it was properly obtained. *It is enough if notification of the interception of evidence not authorized by the original order be clearly provided in the renewal and amendment application papers.* A judge presumably will scrutinize any application and will scrupulously impose the restrictions required by statute." 480 F.2d at 783 (emphasis supplied).

Thus, although a subsequent court authorization or approval issued after express delineation of offenses "other than those specified in the order" unquestionably satisfies § 2517(5), it does not represent the only method of compliance. We have adhered to the view that the disclosure in subsequent affidavits to the issuing judge of material facts constituting or clearly relating to other offenses satisfies the requirements of § 2517(5) under the "*Tortorello* rationale of implicit authorization," *United States v. Marion, supra,* 535 F.2d at 703, 704 n. 13. See also *United States v. Rizzo,* 492 F.2d 443, 447 (2d Cir.), *cert. denied,* 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974); *United States v. Moore,* 168 U.S.App.D.C. 227, 513 F.2d 485, 502 (1975).

Applying this interpretation of § 2517(5) to the present case, the interstate phone call from Schultz to Masciarelli was clearly set forth in the First Day Report required by Judge Port and, as we stated in *United States v. Marion,* 535 F.2d at 703, "we presume, as in *United States v. Tortorello, supra,* that in renewing [here continuing] the tap the judge carefully scrutinized those supporting papers and determined that the statute's requirements had been satisfied." The disclosure of a wealth of relevant, highly material conversations relating to the operation of a gambling business indicated that the finding of probable cause was justified and therefore "the original order was lawfully obtained." The fact that 275 of 283 conversations intercepted related to the operation of a gambling business in violation of § 1955, including the interstate conversation evidencing a violation of § 1084, was sufficient indication that "the original order was sought in good faith and not as a subterfuge search." Since the detailed facts set forth in the report clearly evidenced a violation of § 1084, it was unnecessary for the government in its Fifth Day Report to specify that statute by number. Moreover, because it was apparent that the government had intercepted the § 1084 communication during the closely related § 1955 investigation, the § 1084 communication was relevant to the § 1955 violation, the government set forth the relevant aspects of the conversation in support of its continuation of the authorization, nothing about the challenged communication or the

surrounding circumstances indicated that the § 1955 investigation was being used as a pretext, and the investigation resulted in indictments charging violations of both § 1955 and § 1084, compare *United States v. Brodson,* there was sufficient evidence before Judge Port that "the communication [relating to § 1084] was in fact incidentally intercepted during the course of a lawfully executed order," even though Judge Port was never apprised, undoubtedly in good faith,[8] that the conversation related to a violation of § 1084 in addition to providing evidence of the § 1955 offense.

■ Under these circumstances, we hold that court authorization required by § 2517(5) was implicitly obtained by the government when Judge Port approved continuation of the wiretap after being fully advised by the Fifth Day Report of the essential facts constituting the unspecified violation, and that suppression of the conversation and dismissal of the indictment was not required.

The order of the district court is reversed and the indictment is reinstated.

---

**8.** At the time he dismissed the indictment, Judge Port stated that appellees' motion had "its origin and initiation through disclosure by the prosecutor" and "that is in the highest tradition of the prosecutor's duty." Such conduct is inconsistent with any notion that the government may have intentionally withheld disclosure that the Akron-Binghamton conversation also violated § 1084, or otherwise acted in less than good faith.